# Richmond

## BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, ETC. v. S. W. McCOMB.

March 2, 1942.

Record No. 2491.

Present, Campbell, C. J., and Holt, Hudgins, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Alfred L. Marchant* and *Catesby G. Jones*, for the plaintiff in error.

*W. M. Minter*, for the defendant in error.

HOLT, J., delivered the opinion of the court.

The Magnet Oil Company of California, a corporation, was organized in 1928. S. W. McComb was president and general manager; he was also its principal stockholder. R. E. Hickerson was its vice president. This Oil Company dealt with the plaintiff bank and borrowed from it various sums of money, all of which were repaid except that represented by the note in controversy.

In 1938, $30,000 was borrowed. The company executed its open note, which was guaranteed by McComb and Hickerson. By payments it was later reduced to $15,000, and a note for that sum, dated August 1, 1938, payable October 31, 1938, was executed and endorsed as was the $30,000 note. Due to dry wells and other causes, this Oil Company was not successful. In an effort to keep it afloat, McComb advanced to it $31,657.32. Other creditors were pressing. McComb called a meeting of them; some came and some did not. In order that operations might be continued, he agreed to subordinate his claim to that of other creditors. An agreement to that effect was drawn up, dated October 1, 1938. At this creditors' meeting the bank was represented by counsel but did not sign the agreement. Management was turned over to a committee.

This effort of McComb to keep his company out of bankruptcy failed. At the instance of some of the Oil Company's creditors, proceedings to have it declared bankrupt were instituted in January, 1939, and on March 9, 1939, it was declared bankrupt.

With the condition of the Oil Company in mind, the bank, between the date of this creditors' agreement and the actual

institution of bankruptcy proceedings, asked for a mortgage on McComb's Virginia property. This McComb was willing to give, and he offered to give "some stock, etc., in settlement." At another time, he offered to deed to the bank his California land "in settlement of my obligation."

These two offers the bank did not accept, and, because the Virginia lands lay so far away, it afterwards abandoned its request for a mortgage on them. He was, however, asked not to deed away any of his property, and to that he agreed and kept his promise.

Later, at the instance of the bank, McComb agreed to assign to it the debt due to him to the Oil Company. That assignment bears date March 29, 1939. At that time the bank was of opinion that McComb's subordination agreement could be set aside. In this it was mistaken; and all that the bank ever received from that source, or from any source, was two dividends, one of date December 8, 1939, for $3,831.13, and one of date July 18, 1940, for $768.23.

This case turns upon the conditions under which that assignment was taken.

Mr. Stevens, a vice president of the bank, testified that it was taken as collateral to McComb's obligation. Mr. McComb contends that it was taken in full settlement of it. To the extent that there is a conflict between the testimony of these two witnesses, who are the only witnesses, we adopt the evidence of the defendant; he has obtained a jury's verdict.

Mr. McComb said:

"I agreed to give this assignment as requested by the bank because I did not think the way the company's affairs were being handled that it could pay out in full, but that it would probably pay enough or more than enough to settle my obligation under the note, and I was anxious to get in a position to free my other property from my obligation under this guarantee so that I could settle with my other creditors. The assignment was prepared by the bank's attorney and I signed it."

He further testifies:

"I did not know up to this time whether the bank meant to take the assignment of my claim against the corporation in settlement of my liability under the $15,000.00 note or merely as collateral. We had discussed both the giving of a mortgage for collateral and the deeding of land or transfer of stock in settlement. Desiring to know where I stood, I asked Mr. Stevens and Mr. Maurer after signing the assignment whether or not they were satisfied with it and they said they were. In order to have the matter perfectly clear, however, I then asked them if the little remaining property I owned was mine and I was at liberty to do what I wanted with it, and both said 'Yes'. I understood from this statement that I was released from further liability on the Oil Co.'s note."

And again:

"When the matter of the assignment was first taken up with me and until I had had the conversation I have detailed with Mr. Stevens and Mr. Maurer I did not know whether the bank wanted it in discharge or as collateral security, but after I made the assignment I asked Stevens and Maurer if they were satisfied and they both said 'Yes' and then told me I could do what I wanted with the rest of my property. I understood from this statement that the bank had released me from further liability on the note."

Accepting, as we must, McComb's statement of what then occurred, we find that, in answer to his question, he was told by the bank that it was satisfied and that he might dispose of his other property as he saw fit. McComb may have understood that the transaction was closed and that his debt to the bank was at an end. The bank may have thought that it was sufficiently secured by the assignment to it of McComb's claims against the Oil Company. It then was of the opinion that the subordination agreement could be set aside. Being satisfied with this assignment, it had no purpose to pester him for other collateral and was willing that he might do with property unassigned as he saw fit. In other words, it is easy to understand that the minds of the parties

never met; and this, though we accord to each the utmost good faith. Each of them must have known that if the subordination agreement stood dividends would fall far short of meeting the amount due on this guaranteed note.

The Republic Supply Company was also a creditor of the Oil Company. McComb was anxious to help it, and before the assignment to the bank, he "had put up certain stock as collateral for the payment of the Republic Supply Company's bill and it still has this stock."

The bank, in its attack upon the subordination agreement, wanted all the help it could get; and it was with an understanding between the bank's counsel and the Supply Company's counsel that this letter was written, a copy of which was sent to McComb:

"Law Offices
CHANDLER & WRIGHT
1 N. Van Nuys Building
210 West Seventh Street
Los Angeles, California

November 13, 1939

"Bank of America,
National Trust & Savings Bank
Los Angeles, California
Attention: Mr. Stevens

Gentlemen:

Confirming my conversation of last Thursday, November 9th, with Mr. Stevens *re* claims of Messrs. Hickerson and McComb against Magnet Oil Company, it is my understanding of our agreement that we are both to use our best efforts to endeavor to have the so-called subrogation provisions of the Creditors Agreement of October 1, 1939, set aside.

It is further agreed between us that in the event any dividends are paid upon the claims of Messrs. Hickerson and McComb against the Magnet Oil Company that the first

$5,000.00 in dividends is to be retained by the Bank, and the excess over $5,000.00 paid on said claims of Messrs. Hickerson and McComb is to be divided equally between the Bank and the Republic Supply Company of California until such time as the first of said parties has been paid in full from all dividends received; thereafter, the full amount of dividends is to be paid to the remaining party until such remaining party has been paid in full, whereupon, *of course*, the remainder if any, will be paid to the person entitled therto, namely either Hickerson or McComb.

"This agreement is being approved by Mr. Hickerson and your signature on the carbon copy of this letter in the space provided for that purpose, will constitute this letter an agreement between the Bank of America and The Republic Supply Company of California, to the effect set forth. (Italics supplied.)

Yours very truly,

CHANDLER & WRIGHT
By JOHN F. GILBERT

The above correctly sets forth our agreement. Subject to approval of S. M. McComb."

On it is this endorsement:

"The above agreement is hereby approved this 24th day of November, 1939.

S. M. MCCOMB"

If the bank took McComb's claim as collateral, it had no right to turn over to the Supply Company any part of dividends on it received. But McComb was interested in setting aside the subordination agreement and was willing that some portion of these dividends be applied on the supply company's claim in consideration of the aid which its counsel was to give, services which, if successful, would have benefited not only the Supply Company but him as well. His consent to that agreement is evidenced by his endorsement.

On May 21, 1940, the bank wrote to McComb, telling him that it had lost out in an effort to set aside the subordination agreement, and in that letter said: "We feel that we should have a mortgage on your Virginia property, to properly protect our loan in case we are not successful in prosecuting the appeal. We assure you that it is not our intention to let the matter ride because, after all, if we win this would be a source of immediate liquidation of our indebtedness, and if we lose it will be necessary for us to give you sufficient time in which to liquidate the indebtedness."

McComb did not reply to this letter. On July 1, 1940, the bank again wrote to McComb and said: "* * * that due to the present situation we felt that we should have a mortgage on your Virginia property."

And it was not until July 18, 1940, that he sent to the bank this letter:

"Dixie, Va. 7/18/40

"Mr. J. G. Stevens Asst V. P.
Bank of America
Los Angeles Cal.

Dear Sir: Yours 1st received several day ago, I also received the letter of May 21st in which you say you think I should give you a mortgage on the Va property, in case you fail to collect anything from the Receiver of Magnet Oil Co on Mr. Hickerson's and my accts against Magnet, which was assigned you some time ago as collateral. I do not agree with you, because you chose the assignments in preference to the mortgage, and I do not think it quite fair to my other creditors to give you everything I have, and leave them out in the cold without anything.

Yours truly,

S. W. McComb."

From the letter of November 13, 1939, it appears that McComb understood that he was to receive anything remaining by way of dividends after the bank's debt and the Supply Company's debt had been paid; and in the letter just quoted he speaks of "my accts against Magnet, which was assigned you some time ago as collateral." That is to say, in this witness' last statement he said that this account was turned over to the bank as collateral.

Banks, like other corporations, grow more impersonal as they grow in size. Small ones are sometimes touched by human emotions. The president of a bank at Middlebrook would do what he could for a debtor who was his friend and who lived upon an adjoining farm; but banks whose assets run into billions are the friends of no one. This bank's assets are about two billions of dollars; it has 494 branches, 65 of which are located in Los Angeles. When a bank like this loans money, it expects to be paid in current currency and takes chips and whetstones when it has to.

McComb's letter supports the bank's contention, and the bank's contention is what we might have expected. A bank is not apt to take in payment of its claim an assignment against a company already in bankruptcy and which was of little value unless some collateral agreement could be set aside. It runs against common experience. And this is doubly true where, as in this case, the debtor had immediately at hand other assets which the bank might have taken.

Since Mr. Stevens did not agree to take in satisfaction of his principal's claim something other than money, and since he took the assignment as collateral, we need not discuss the measure of his authority.

This case, to an extraordinary degree, turns upon its facts. No principles of law are involved except those everywhere conceded. If McComb's claim was turned over to the bank in settlement of the bank's debt, that is, of course, the end of the bank's claim; if the bank took it as collateral, it is to be treated as collateral and in no wise differs from our everyday transactions when collaterals are assigned to banks as additional security. It would be a waste of printer's ink

to cite authorities in support of a proposition which nobody questions.

The argument in this case has taken a wider range than its necessities call for, for, as we have seen, if the bank has been paid, it is out; and if it has not, it can do whatever it is advised in the prosecution of its own interests.

R. E. Hickerson seems to have dropped out of the picture.

For reasons stated, this case is reversed and remanded.

*Reversed and remanded.*

Browning, J., dissenting.